United States Bankruptcy Court
Eastern District of Michigan
Southern Division

In re:
Matthew G. Strickfaden,                                              Case No.07-58885-R
                      Debtor.                                  Chapter 7
_____/

R. Bart Sangal and JoAnne Sangal,
                      Plaintiffs,

v.                                                                    Adv. No. 07-6788-R

Matthew G. Strickfaden,
                      Defendant.
_____/

Opinion

I. Introduction

On April 29, 2002, Dr. R. Bart Sangal and his wife Joanne Sangal entered into a contract with Matthew G. Strickfaden & Associates (MGS), for the company to act as general contractor and project manager for the construction of the Sangals' home in Bloomfield Hills, Michigan. The Debtor, Matthew G. Strickfaden was the principal for MGS and signed the contract as the agent for the company.

From early on, the relationship between the parties did not go smoothly. Strickfaden asserts that the Sangals did not fund billing requests in a timely manner. The Sangals assert that Strickfaden misappropriated funds from their project for use on other projects. By November 26, 2002, the parties executed an addendum to the contract. Under the addendum, the construction expenses were to paid from an account separate from that holding the contractor's fees; and an escrow agent's

permission would be required in order to pay funds from the account.

The relationship continued to deteriorate. On March 23, 2003, the parties entered into a second addendum, under which MGS agreed to reimburse a $16,106.03 cost overrun.

In July 2003, the parties entered into a third addendum. The third addendum prohibited MGS from expending any sums for allowance[1] items without guaranteeing that the expenditures in the entire allowance category would not exceed the amount listed in the estimate of costs; required MGS to seek the Sangals' approval to discharge liens; and required MGS to submit to the Sangals the change orders for changes previously implemented without their prior approval, with supporting documentation.

In September 2004, the architect certified several breaches of contract by MGS. The architect's final accounting indicated $42,101.85 in unauthorized transfers and $33,009.39 in unearned project-management fees. At that time, the Sangals terminated their contract with MGS.

Following MGS's termination, Strickfaden sent letters to subcontractors involved in the project. The letter informed the contractors that MGS had been terminated, that the contract between MGS and the subcontractor was null and void, and instructed the subcontractor to stop working on MGS's behalf.

In November 2004, the Sangals filed a lawsuit against MGS and Strickfaden personally in the Oakland County Circuit Court. The complaint against Strickfaden included causes of action for

---

1. The contract provided three categories of expenses. For the first category, referred to as "guaranteed not to exceed," the project manager gave an estimate of cost for certain items, such as steel, plumbing, rough carpentry, heating, etc, and guaranteed that in the aggregate the cost of those items would not exceed the estimate for the category. The second category was called "allowance items." For these items, the project manager provided a good faith estimate, which could be exceeded. These items were to be dealt with on a case by case basis. The last category was items that the owners would pick out themselves with no input from the project manager. The project manager simply administered those items as part of his project management fee.

fraud, breach of fiduciary duty, violation of the Michigan Builders Trust Fund Act, and conversion.

In September 2007, Strickfaden filed a Chapter 7 bankruptcy petition. The Sangals filed this adversary proceeding against Strickfaden seeking a determination that debts owed to them by Strickfaden are not dischargeable pursuant to § 523(a)(2)(A), (a)(4) and (a)(6).[2]

The court conducted a trial over the course of four days, March 31, 2009, April 16, 2009, July 14, 2009, and July 16, 2009. The court heard testimony from Matthew Strickfaden, Dr. Sangal, and Todd Young, the architect. At the conclusion of the trial, the Court took the matter under advisement.[3]

## II. The Claim Under § 523(a)(4)

### A. Applicable Law

The Sangals assert that Strickfaden violated, or caused his company to violate, the Michigan Builders Trust Fund Act.[4] Specifically, the Sangals allege that Strickfaden submitted sworn statements requesting funding for payments for subcontractors, labor and materials, and then, rather than paying those listed on the sworn statement, instead paid labor and material expenses incurred by his own company. Additionally, the Sangals assert that the labor charged by Strickfaden either

---

2. The final pretrial order states two claims pursuant to § 523(a)(2)(A). First, the Sangals assert fraud based on the use of incorrect roofing material. Second, they assert fraud for MGS's failure to pay certain subcontractors. Plaintiff did not present or support any argument related to § 523(a)(2)(A) during the course of the trial. Rather, the Sangals focused almost exclusively on their § 523(a)(4) claim for violation of the Michigan Builders Trust Fund Act. During closing arguments, Plaintiffs' attorney specifically abandoned the § 523(a)(2)(A) claim regarding the roofing. (Tr. 07/16/2009 at p. 30.) Accordingly, the Court finds that the § 523(a)(2)(A) claims have been abandoned and they will not be addressed in this opinion.

3. The Court ordered a full transcript of the trial, which was filed on September 14, 2009.

4. Officers of a corporation may be held individually liable when they personally cause their corporation to act unlawfully. *Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 742 N.W.2d 140,143-44 (Mich App. 2007).

3

was not actually performed or if performed, was not authorized. The Sangals argue that this payment to unauthorized labor rather than to the subcontractors for whom the funds were designated was a defalcation and therefore nondischargeable pursuant to § 523(a)(4).

11 U.S.C. § 523(a)(4) excepts from the discharge a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny. "A debt is non-dischargeable as the result of defalcation when a preponderance of the evidence establishes: (1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss." *In re Patel*, 565 F.3d 963, 968 (6th Cir. 2009). The Sixth Circuit has adopted a narrow interpretation of "fiduciary" as used in § 523(a)(4). *R.E. America, Inc. v. Garver* (*In re Garver*), 116 F.3d 176, 179 (6th Cir.1997). To trigger the defalcation provision in that statute, a debtor must hold funds in a trust for the benefit of a third party. *Id.* at 179. Furthermore, the types of trusts that trigger the defalcation provision of § 523(a)(4) are "limited to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Id.* at 180.

The Sixth Circuit has held that the Michigan Builders Trust Fund Act makes the contractor a fiduciary with respect to the funds paid to him by the owner so as to render the debt arising from the contractor's misapplication of those funds a defalcation under § 523(a)(4) of the Bankruptcy Code. *Carlisle Cashway, Inc. v. Johnson* (*In re Johnson*), 691 F.2d 249 (6th Cir.1982). Under § 523(a)(4), a defalcation occurs when a debtor either misappropriates or fails to properly account for those funds held in a trust. *Garver*, 116 F.3d at 180 (citing *Capitol Indemnity Corp. v. Interstate Agency, Inc.* (*In re Interstate Agency, Inc.*), 760 F.2d 121, 125 (6th Cir.1985)). This standard does not require a showing that the debtor acted intentionally, although a showing of mere negligence is insufficient. *Johnson*, 691 F.2d at 255-57.

The Michigan Builders Trust Fund Act, set forth in M.C.L.A. § 570.151, provides:

4

> In the building construction industry, the building contract fund paid by any person to a contractor, or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes.

The effect of this statute is to impose a trust, with the contractor as the trustee, upon the funds paid by any person in connection with a building contract. *Huizinga v. United States*, 68 F.3d 139, 144 (6th Cir.1995). Accordingly, a violation of the Michigan Builders Trust Fund Act is an act of defalcation while acting in a fiduciary capacity as applied to § 523(a)(4).

### B. The Evidence

The evidence establishes that Strickfaden acted both individually and on behalf MGS as a general contractor for the Sangals. Accordingly, the funds he received from the Sangals were imposed with a trust pursuant to the Michigan Builders Trust Fund Act.[5] Strickfaden, as the contractor, bears the burden of accounting for the funds he received from the Sangals. *In re Little*, 163 B.R. 497, 500-01 (Bankr. E.D. Mich. 1994) ("[w]here a trustee is called upon in a court of equity to account for the funds received by him as trustee, ... the duty rests upon him to so account, and the burden of proof is upon him to establish the correctness of the account." *Citing Grund v. First Nat'l Bank of Petoskey*, 209 Mich. 613, 615, 177 N.W. 299 (1920)). *See also, e.g. Mertz v. Mertz*, 18 N.W.2d 271 (Mich. 1945); *Long v. Earle*, 269 N.W. 577 (Mich. 1936); *Raak v. Raak*, 428 N.W.2d 778 (Mich. App. 1988).

Strickfaden offered into evidence 75 exhibits to account for the funds he received from the

---

5. Strickfaden had argued that the funds he received were not contractually required to be held in trust until after the Addendum. This argument must be rejected because Michigan law imposes a trust on funds received by contractors regardless of the contract language or type of banking system used or required by the contract.

5

Sangals. These exhibits include summaries of his labor and expenses, sworn statements submitted to the Sangals, statements from the client trust account, check analysis and detail reports, and summaries of all his income and expenses from his QuickBooks Acccounting Program. Additionally, the Sangals offered 366 exhibits including the contracts, addendums, sworn statements, Strickfaden's transaction details, Strickfaden's bank statements and copies of checks written on behalf of MGS.

The Sangals assert that early on in the relationship, Strickfaden used their funds for other projects. Strickfaden admitted this use, asserting that the contract had not required a trust fund and that he was not aware of the requirements of the Michigan Builders Trust Fund Act. The addendum signed November 26, 2009, dealt with this issue by requiring a trust fund and requiring MGS to pay interest on the funds it had previously used on other projects. The Sangals have not alleged a claim or requested any damages for this initial misappropriation.[6] Rather, the Sangals have focused their case on the funds requested in Sworn Statement #5, dated December 10, 2003. The architect approved that funding request on December 16, 2003, and Dr. Sangal testified that he fully funded the request.[7] Strickfaden's transaction detail (Pl. Ex. 167.) reflects two deposits by

---

6. The testimony and evidence establish that Strickfaden repaid all of the money he misappropriated early in the building project. Plaintiff's attorney stated it would be difficult for them to show what, if any, delay was caused by the initial misappropriation. Accordingly, it would be difficult for Plaintiff to show a loss related to this initial misappropriation.

7. Strickfaden asserted that Dr. Sangal only paid $71,261.19, approximately half of the funding request from Sworn Statement #5. (Tr. 3/31/2009 at 67-70.) Strickfaden gave an accounting showing that he spent $79,548 on the project shortly after receipt of $71,261.19 from the Sangals. (Def. Ex. P.) In his accounting, Strickfaden shows payments to subcontractors, as well as to MGS for labor costs and materials and earned project management fees. However, Strickfaden did not address the additional $75,000 deposit on February 2, 2004 during his testimony about Sworn Statement #5. Strickfaden's records do show receipt of the additional $75,000 and his records show that the $75,000 was used on the project for subcontractors as well as MGS labor and materials.

Sangal into the Trust Fund account. One on December 16, 2003 for $71,261.19 and another on February 2, 2004 for $75,000. Dr. Sangal asserts that the following subcontractors were listed on the sworn statement, but were not paid from those funds:

|  |  |
|---|---|
| Place Stone | $15,000 |
| Caterpillar Generator | $13,550 |
| Gravel/Stone Back Fill | $1,500 |
| Anderson Pools | $3,000 |
| New Generation Masonry | $5,000 |
| Eon/EPOM Decking | $7,500 |
| Emmet Fireplace | $800 |
| Unique Media Electric | $2,500 |
| Eco Built[8] | $5070 |
| Innovative Product Sales[9] | $10,781 |
| TOTAL funded but not paid | $64,701 |

Dr. Sangal testified that he had to pay bills from these subcontractors for work done during the time covered by this sworn statement. (Tr. 07/14/2009 at p. 142.)

Strickfaden admits that he did not pay these particular subcontractors at the time of this sworn statement. Strickfaden asserts that the sworn statements include estimates of work to become due in the next 30 days. Strickfaden asserts that these subcontractors did not do the work during this time frame so they were not paid from these particular funds. In some cases, the subcontractor never

---

8. Funding Request $15,000, Strickfaden paid $9930, leaving $5,070 unpaid

9. Funding Request $20,000, Strickfaden paid $9219, leaving $10,781 unpaid

7

did any work, and instead, a different subcontractor did the job. (Tr. 3/31/2009 at 72-74.)

Strickfaden's argument that he did not violate the trust because the bills to those subcontractors were not due when he paid his own project management fees from the funds must be rejected. In *People v. Miller*, 259 N.W.2d 877 (Mich App 1977), the defendant made a similar argument. The Michigan Court of Appeals explained:

> Defendant hinges his argument on the fact that technically no one was "unpaid" at the time the Bundy downpayment was used. This is because no one was under contract to do any work on the Bundy pool. In construing an arguably ambiguous statute, we look to the spirit and purpose of the legislation to give it a reasonable construction. *Lincoln Park Detention Officers v. Lincoln Park*, 76 Mich. App. 358, 256 N.W.2d 593 (1977), *Royal Oak School District v. Schulman*, 68 Mich. App. 589, 593, 243 N.W.2d 673 (1976). Because the Building Contract Fund Act is a remedial statute, designed to protect people of the state from fraud in the construction industry, we construe it liberally for the advancement of the remedy. *People v. Bandy*, 35 Mich. App. 53, 57, 192 N.W.2d 115 (1971). In light of the statutory purpose and the statutory language referring to future obligations of the contractor, **we hold that a trust is imposed as to funds which will be needed to pay laborers, subcontractors or materialmen who will have to be hired to complete the particular construction project**. In this sense the laborers or materialmen necessary to complete the Bundy pool were "unpaid". To rule any other way would allow only the most unscrupulous offenders to escape the statutory prohibition allowing those who have done no work or ordered no materials whatever to claim the statute was not violated since no one was "unpaid".

*Miller*, 259 N.W.2d at 343-44 (emphasis added).

The Sixth Circuit Court of Appeals explains, "Indeed: 'The fiduciary relationship established by the [MBTFA] arises at the time any monies are paid to the contractor or subcontractor whether or not there are any beneficiaries of the trust at that time and continues until all the trust beneficiaries have been paid.'" *In re Patel*, 565 F.3d 963, 969 (6th Cir. 2009) (*quoting Johnson*, 691 F.2d at 253).

Accordingly, when Strickfaden received funds from the Sangals following Sworn Statement #5, he held those funds in trust for all subcontractors, laborers and materialmen. He was not entitled

8

to use the funds for other purposes, such as paying his own fees, until all the subcontractors, even those who would do future work, had been paid. *Patel*, 565 F.3d at 971 (Chapter 7 debtor-contractor who, out of funds that he received for work on construction project, paid his own operating expenses, including payroll, utilities, taxes and wages to himself, before he sent any money to subcontractor, which never received payment for its work on project, acted in objectively reckless manner and was guilty of "defalcation," of kind preventing discharge of his debt to subcontractor as one for his "defalcation while acting in a fiduciary capacity.") Strickfaden admitted that he paid his own project management fees from the funds received from the Sangals following Sworn Statement #5. (Tr. 3/31/09 at p. 72.) Accordingly, the Court finds that Strickfaden did breach his fiduciary duty.

Section 523(a)(4) has three elements: (1) a fiduciary relationship, (2) a breach of fiduciary duty, and (3) a resulting loss. *Patel*, 565 F.3d at 968. The Sangals established that Strickfaden had a fiduciary duty to them pursuant to the Michigan Builders Trust Fund Act. As a trustee under the Act, Strickfaden was required to account for funds given to him, and to pay subcontractors before he paid himself. Because he collected funds for certain subcontractors previously listed and did not pay them, a breach of fiduciary duty has been established.

The burden then shifts back to the Sangals to prove that a loss resulted from the breach. *Little*, 163 B.R. at 503-04 (noting that in a defalcation case, Plaintiff first has the burden of proving a fiduciary relationship, the burden then shifts to the trustee to establish that the assets received by him were actually used for the benefit of the intended beneficiary of the trust.) A failure to properly account for trust funds creates a presumption of a loss attributable to trustee misconduct. *Id.* However, if a defendant provides an accounting that shows only a technical breach, then the plaintiff must demonstrate a loss resulting from the breach. *See id.* (Noting in dicta, that if defendant could

9

show that he simply underestimated the cost of completing the project and that all funds received from the plaintiff were in fact spent on the project, then there would be no defalcation.) *See also Michigan v. Looze*, 2002 WL 31421764 at * 2 (Mich. App.) (unpublished) ("prosecutor must show more than the fact that a . . . subcontractor... went unpaid.... it is possible for money to still be owed without any misdoing by defendant. . . the proof. . . lies in the accounting and whether the prosecution could prove that not all of the [funds] went toward contract-related bills.").

The Court concludes that the Sangals have not proven a loss resulting from Strickfaden's breach of fiduciary duty. Strickfaden asserts that he did not pay those particular subcontractors because they were not entitled to payment when he held funds in trust for the Sangals. (Tr. 3/31/2009 at p. 73-74.) Dr. Sangal asserts that the subcontractors eventually did the work, or other contractors did the work anticipated on the sworn statement and that he had to pay for that work himself. (Tr. 7/14/2009 at p. 141-47.) The difficulty arises because the Sangals did not support Dr. Sangal's testimony with any corroborating documentary evidence. They submitted no paid or unpaid invoices demonstrating that work intended to be performed by the subcontractors listed on Sworn Statement #5 who were unpaid was actually completed at their expense. On cross-examination, Dr. Sangal admitted he could not show a bill that was not timely paid during the time Strickfaden was the project manager. (Tr. 07/14/2009 at p.159, 161.)

In spite of the lack of documentary evidence, the Sangals assert that the testimony of Dr. Sangal should be sufficient to prove a loss. The Court does not find that Dr. Sangal's testimony alone is enough to prove a loss. He simply was not that credible as a witness at trial. Accordingly, because the burden of proving the loss is on the Sangals, the Court finds that they have not met their burden, and the Court will not award damages for the breach of fiduciary duty.

The Sangals also assert that Sworn Statement #6 (Pl. Ex. 165) includes an admission by

Strickfaden that he paid unauthorized labor and material costs to MGS and paid unearned project management fees to himself. (Tr. 4/14/2009 at p. 112-113.) The Sangals argue that these payments are a breach of fiduciary duty. Strickfaden denies that he paid MGS any unauthorized labor or unearned project management fees, and he unequivocally denies agreeing to repay $43,101.85 and/or $14,628.28 to the Sangals. (Tr. 7/14/2009 at p. 47-48.)

The Sangals' primary argument that the labor is unauthorized is the assertion that it was not pre-approved by Dr. Sangal. The question about whether MGS labor had to be pre-approved by Dr. Sangal is a contract dispute between the parties. The original contract did not give the Sangals the right to pre-approve labor costs. (Pl. Ex. 1, Art. 7.1.1.1.) The third addendum dealt with a labor dispute regarding work done by laborer Richard Cote. (Pl. Ex. 4.) The third addendum required pre-approval of expenditures in "allowance" categories unless the project manager guaranteed that the expenditure would not cause the category to go over budget and the expenditure was not of the nature normally reserved to the owner's choice. The third addendum did not specifically require all MGS labor to be pre-approved.

The first indication in the record of Dr. Sangal's desire to pre-approve all MGS labor is a letter to Strickfaden and the architect, dated June 28, 2003. (Pl. Ex. 170.) (Tr. 7/14/2009 at p. 107.) In the letter, Dr. Sangal asked why certain labor was not approved in advance. (Tr. 7/14/2009 at p. 115.) However, the letter does not make any reference to any contract provision or addendum providing a right for pre-approval.

Dr. Sangal also testified that in December 2003, he told Strickfaden in person that he absolutely had to have pre-approval for any MGS labor or the Sangals would not pay for it. (Tr. 7/14/2009 at p. 126.)

On May 4, 2004, Dr. Sangal sent another letter to Strickfaden. (Pl. Ex. 169.) Dr. Sangal

testified that this letter was a follow-up to a conversation with Strickfaden that occurred on May 3, 2004, and sent in anticipation of a meeting on May 5, 2005. (Tr. 7/14/2009 at p. 136.) The May 4, 2004 letter states that Strickfaden was unable to explain labor charges for MGS and that he had agreed to provide an accounting by May 12, 2004. Dr. Sangal stated that if Strickfaden could not show that the labor was authorized then it would not be paid. Further, Dr. Sangal stated that he wanted to reiterate that all MGS labor needed to be pre-authorized or it would not be paid.

These letters show a desire on Dr. Sangal's part to have control over the labor costs generated by MGS. However, the Sangals have not offered any evidence that Strickfaden ever agreed to give the Sangals this degree of control. The Sangals have not offered any signed document that changed the terms of the contract to require Dr. Sangal's pre-approval for MGS labor to be paid. Strickfaden testified that he never agreed to Dr. Sangal's demand to pre-approve MGS labor. (Tr. 7/14/2009 at p. 98.) Accordingly, the mere fact that MGS labor was not pre-approved cannot be the sole basis for a determination that it was not authorized by the contract. If MGS labor caused an allowance category to go over budget, then the Sangals may have had grounds for refusing to pay the over-budget amount. However, that would be a contract issue and not grounds for finding a violation of the Michigan Builders Trust Fund Act. Indeed, MGS laborers were as much beneficiaries of the trust as other laborers and subcontractors. The Michigan Builders Trust Fund Act protected their right to payment as well. Strickfaden provided time sheet details for hours worked by each employee, as well as the type of work done on the project. (Pl. Exs. 287-308.) This accounting was sufficient to justify his payment to them from the funds held in trust.

The second issue raised regarding MGS labor was the allegation that Strickfaden over-charged for MGS labor. The Sangals assert that Strickfaden over-billed them for the hourly rate of each employee because the rate the employee made per hour was not the rate charged to the Sangals.

12

Strickfaden explained that he charged a set hourly rate for each employee that incorporated their hourly rate as well as benefits that MGS paid on the employees behalf, and also incorporated taxes and worker's compensation insurance. (Tr. 3/31/2009 at p. 99, 113-115; Tr. 7/14/2009 at 49-51; Def. Ex. BE.) The contract states that the Sangals will pay wages and costs including taxes, insurance, and benefits including sick and vacation pay as well as other benefits. (Ex. 1, Art. 7.1.1.4.)

The Sangals tried to discredit Strickfaden's calculations by arguing that workers compensation was not actually paid because the employees were independent contractors. (Tr. 7/14/2009 at p. 154-169.) However, Strickfaden's QuickBooks ledgers show that he had made the workers compensation insurance payments. (Def. Ex. BA.) In any event, the allegation of over-charging for labor is really an allegation of actual fraud. If proven, a debt arising from actual fraud is nondischargeable pursuant to § 523(a)(2)(A) or (a)(4). The Sangals would bear the burden of proof on an actual fraud claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654 (1991). The evidence before the Court does not carry that burden of proof.

The final allegation with regard to labor was that the workers were not physically present and did not do the work asserted by Strickfaden. Dr. Sangal testified that he was often at the job site and did not see MGS laborers present. (Tr. 7/14/2009 at p. 113-114, 130-131.) He also testified that he would not know who some of the laborers were. (Tr. 7/14/2009 at p. 134.) Again, this allegation is one of actual fraud that was not asserted in the Final Joint Pre-trial order and not properly argued at trial. Again, the Sangals would bear the burden of proof on this claim and the evidence before the Court does not meet that burden of proof.

Accordingly, the Court finds that although Strickfaden did breach his fiduciary duty by not paying specific subcontractors for whom he had received funds in Sworn Statement #5, the Sangals

did not prove a loss resulting from that breach. Therefore, no damages are awarded. Further, the Court finds no breach of fiduciary duty based on Strickfaden's payment of funds to MGS laborers. Therefore, the claim under § 523(a)(4) is dismissed.

### III. The Claim Under § 523(a)(6)

The Sangals also assert a cause of action pursuant to § 523(a)(6). Section 523(a)(6) prohibits the discharge of debts that arose due to a willful and malicious injury by the debtor to another entity or to the property of another entity.

> The willful and malicious standard is a stringent one, and "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Kawaauhau v. Geiger*, 523 U.S. 57, 64, 118 S. Ct. 974, 140 L. Ed.2d 90 (1998). The Sixth Circuit, post *Geiger*, has held that "[a]n intentional or deliberate act alone does not constitute willful and malicious conduct under § 523(a)(6)." *In re Romano*, 59 Fed.Appx. 709, 2003 WL 731723, at *6-7 (6th Cir. 2003). Instead, the creditor must prove that the debtor intended a deliberate or intentional injury, not merely a deliberate or intentional act that causes injury. "[Unless] the actor desires to cause [the] consequences of his act, or ... believes that the consequences are substantially certain to result from it, he has not committed a willful and malicious injury as defined under § 523(a)(6)." *In re Kennedy*, 249 F.3d 576, 580 (6th Cir.2001) (citation and internal quote omitted).

*Wade v. Girardin* (*In re Girardin*), 366 B.R. 720 (Bankr. W.D. Ky 2007). The Sangals bear the burden of proving all elements pursuant to § 523(a)(6).

The Sangals have asserted two grounds for their § 523(a)(6) claim. First, they assert tortious interference with business relationships based on the letters that Strickfaden sent to subcontractors. The letter to each subcontractor stated that MGS had been terminated and that the subcontractor's contract with MGS was null and void. It also instructed subcontractors not to do additional work on the property on MGS' behalf. The Sangals allege that as a result of these letters, they had to spend an addition $10,000 to get painting completed.

Strickfaden testified that he simply wanted the subcontractors to understand that after his

14

termination, he was not responsible to pay bills for work done on the property. (Tr. 3/31/2009 at p. 52-53.) Strickfaden pointed out that the letter stated to "stop work on my behalf." Strickfaden testified that at the time he sent the letters, he did not realize that Sangal had the right to assume contracts. (Tr. 4/16/2009 at p. 196.) Moreover, Strickfaden testified that he did not have any desire to harm the Sangals, but that he simply wanted to avoid incurring any further liability himself. (Tr. 4/16/2009 at p. 198.) The Court finds that Strickfaden's explanation is credible and finds that the Sangals have not established that Strickfaden intended to cause an injury to Sangal in sending the letters to subcontractors.

Second, in the Final Pretrial Order, the Sangals allege that Strickfaden's overall conduct was willful and malicious, causing more than $237,940.60 in total damages. In closing argument, Plaintiff's counsel only made cursory reference to this general allegation. Moreover, the Sangals made no real effort to prove that Strickfaden's conduct during the course of the business relationship was done with an intent to harm the Sangals. While Strickfaden's testimony regarding his methods of accounting and paying his employees was somewhat confusing, it was sincere and well-intentioned. The Court finds no evidence that Strickfaden intended to harm the Sangals. Further, the Court does not find that Strickfaden should have known that an injury was substantially certain to occur. Therefore, the claim under § 523(a)(6) is dismissed.

Conclusion

The Court finds for the defendant, Matthew G. Strickfaden on all counts of the complaint. The complaint is dismissed.

For Publication

**Signed on December 18, 2009**

                                                    <u>**/s/ Steven Rhodes**</u>
                                                  **Steven Rhodes**
                                                  **United States Bankruptcy Judge**